UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re

NINA MARIE BARBIERI,

               Debtor.
--------------------------------------------------------x

Chapter 7

Case No.: 00-22274-478

# MEMORANDUM DECISION AND ORDER

*Appearances:*

Jones and Schwartz, P.C.
*Attorneys for John S. Pereira, Chapter 7 Trustee*
By: Harold D. Jones, Esq.
One Old Country Road, Suite 384
Carle Place, New York 11514


Coritsidis & Lambros, PLLC
*Attorneys for RAJ Acquisition Corp.*
By: Michael N. Coritsidis, Esq.
46 Trinity Place, 4th Floor
New York, New York 10006


Law Offices of Norman Trabulus
*Attorneys for* Louis Barbieri
By: Norman Trabulus
345 Seventh Avenue, 21st Floor
New York, New York 10001


Honorable Dorothy Eisenberg, United States Bankruptcy Judge

Before the Court is the Chapter 7 Trustee's Motion seeking this Court's authorization to enter into a settlement agreement with RAJ Acquisitions Corp. ("RAJ") to resolve RAJ's filed claim for damages against the Debtor's bankruptcy estate with respect to the Debtor's alleged breach of contract for the sale of real property. Louis Barbieri ("Barbieri"), the Debtor's father and a creditor of the Debtor's estate, has opposed the settlement agreement alleging that RAJ had repudiated the contract of sale and should not be entitled to any damages. The issues before the Court are whether the creditor has a valid claim for beach of contract and, if so, should this offer of compromise be approved pursuant to Fed. R. Bankr. P. 9019. For the reasons stated below, this settlement is not approved.

This Court has jurisdiction over this core proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (B) and (O) and 11 U.S.C. § 502. The following constitutes the Court's finding of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## FACTS

In January of 1998, Charles Levas, Esq. ("Levas"), an attorney on behalf of the Debtor, entered into discussions with RAJ to sell 86 East 3rd Street, New York, New York (the "Premises"). The Premises is a mixed use building consisting of 20 residential apartment units and 2 partially below ground level retail stores owned by the Debtor. All residential apartment units were rent regulated. At that time, there was a rent strike by the tenants at the Premises and an Article 7A proceeding under N.Y. Real Property Actions and Proceedings Law had been commenced against the Debtor in state court based upon the existence of hazardous conditions at the Premises. On February 25, 1998, the Debtor signed a contract (the "Contract") to sell the Premises to RAJ for $585,000 (the "Purchase Price"). On March 4, 1998, RAJ made a down

payment of $25,000 (the "Down Payment") to the Debtor, which was deposited in Levas's IOLA

account.

Section 13.02 of the Contract contains standard form language setting forth the

following:

> If Seller shall be unable to convey title to the Premises at the Closing in
> accordance with the provisions of this contract or if Purchaser shall have any
> other grounds under this contract for refusing to consummate the purchase
> provided for herein, *Purchaser, nevertheless may elect to accept such title as
> Seller may be able to convey with a credit against the monies payable at the
> Closing equal to the reasonably estimated cost to cure the same (up to the
> Maximum Expense described below), but without any other credit or liability on
> the part of the Seller.  If Purchaser shall not so elect, Purchaser may terminate
> this contract and the sole liability of Seller shall be to refund the Downpayment to
> Purchaser* and to reimburse Purchaser for the net cost of title examination, but not
> to exceed the net amount charged by Purchaser's title company therefor without
> issuance of a policy, and the net cost of updating the existing survey of the
> Premises or the net cost of a new survey of the Premises if there was no existing
> survey or the existing survey was not capable of being updated and a new survey
> was required by Purchaser's Institutional Lender.  Upon such refund and
> reimbursement, this contract shall be null and void and the parties hereto shall be
> relieved of all further obligations and liability other than any arising under
> Section 14 [concerning brokers].  *Seller shall not be required to bring any action
> or proceeding or to incur any expenses in excess of the Maximum Expense
> specified in Schedule D (or if none is so specified, the Maximum Expense shall be
> one-half of one percent of the Purchase Price) to cure any title defect or to enable
> Seller otherwise to comply with the provisions of this contract*, but the foregoing
> shall not permit Seller to refuse to pay off at the Closing, to the extent of the
> monies payable at Closing, mortgages on the Premises, other than Existing
> Mortgages, of which Seller has actual knowledge. (Emphasis added).

The Contract contained two riders signed by RAJ and the Debtor, the second of which

sets forth the following in pertinent part:

> 1. Regarding 13.02.  Seller shall be obligated to satisfy all of the exceptions set
> forth in the attached Title No. M-9701199 A; plus any additional or other defects
> or encumbrances in a liquidate (sic) amount up to $25,000.00.  *In no event shall
> the foregoing require Seller to exceed the purchase price, as reduced by all
> typical closing expenses, e.g. legal fees, transfer taxes, etc.*  If Seller cannot

2

comply her sole liability will be to refund purchaser's down payment.
. . .
3. Any mortgage presently affecting the Premises which Seller is required to discharge in accordance with the provisions of this Contract shall, at Purchaser's option and without charge or cost to Purchaser, either be satisfied or assigned to Purchaser or Purchaser's designee and all original notes, mortgages and prior assignments shall be delivered to Purchaser or its designee at the Closing. (Emphasis added).

The title report accompanying the Contract was dated January 19, 1998 (the "Initial Title Report") and excepted from coverage certain liens and mortgages listed in "Schedule B" to the Initial Title Report.  These exceptions included, *inter alia*, taxes, tax liens, water rates, sewer rents and assessments; a lien for emergency repairs; a first mortgage held by Tormax Realty Corp.; a second mortgage interest held by Lena Barbieri which was assigned for the benefit of The Law Firm of Hoccheiser and Aronson to secure a $169,500 judgment which was docketed on August 6, 1992; and various liens filed by the Environmental Control Board.  Included in Schedule B was a Form UCC-1 filed on July 21, 1997 in favor of Bridge Funding, Inc. ("Bridge Funding") for a security interest in fixtures and personal property attached or used in connection with the Premises.  RAJ did not obtain an updated title report immediately before the Contract was signed but rather relied upon the Initial Title Report.  There is also no evidence that RAJ inquired any further about why Bridge Funding would have any claim on the Debtor's fixtures and personal property at the Premises even though it was on notice that Bridge Funding had a claim against the Debtor's property.

On March 27, 1998, more than a month after the Contract was signed, the title company amended Schedule B of the title report to include a mortgage given to Bridge Funding on July 7, 1997 by the Debtor and 189-30 Realty Corp., a related corporate debtor, in consideration for a $350,000 loan to 189-30 Realty Corp.  The mortgage gave Bridge Funding a security interest not

3

only in real property located at 189-30 37th Avenue, Flushing, New York (the "Flushing Property") but also a third mortgage interest in the Debtor's Premises even though the $350,000 loan was for the benefit of 189-30 Realty Corp. Although Bridge Funding received the mortgage in 1997, it did not have the mortgage recorded in New York County where the Premises is located until February 13, 1998 because the title company to which it had given the mortgage to record failed to ensure that it was recorded shortly after its receipt.

Prior to the signing of the subject Contract, the Debtor and 189-30 Realty Corp. had brought a lawsuit against Bridge Funding in November of 1997 to declare the mortgage against the Flushing Property and the Premises a nullity due to alleged violations of New York usury laws. However, the state court action was dismissed on or about March 16, 1998 after the subject Contract was signed. The Court does not have any information regarding why the state court action was dismissed or whether RAJ had any knowledge of the state court action at the time the Contract was signed. The Debtor however, must have known of this mortgage as it was already the subject of litigation in the state court.

The Debtor filed for bankruptcy relief under Chapter 13 of the Bankruptcy Code on March 24, 1998, which was three days before the title company amended the title report to reflect Bridge Funding's 1997 mortgage lien against the Premises and less than 90 days after such mortgage lien was recorded.

On April 8, 1998, Levas stated in a letter to RAJ's counsel that he was returning the Down Payment as "[the Debtor] has elected to cancel said contract of sale due to her inability to satisfy existing liens of record from the net proceeds. In addition, [the Debtor] has filed a petition in Bankruptcy under Chapter 13 of the United States Bankruptcy Code. Accordingly,

the transaction is now deemed null and void and all of the rights of the parties have now ceased."

The $25,000 check was negotiated and deposited.

On April 14, 1998, RAJ's counsel returned the Debtor's refund of the Down Payment along with a letter stating that "there is no basis to cancel the agreement. Not only is your client obligated to satisfy all mortgages of record, but your client has the means to do so.  Specifically, the $350,000.00 mortgage is secured by another property, which is owned by 189-30 Realty Corp.  It is your client's refusal to sell or otherwise involve the other property which is preventing a resolution. . . ."

On April 20, 1998, Levas sent another check in the amount of the Down Payment to RAJ's counsel and again stated that the Debtor was not liable to satisfy existing liens beyond the net proceeds of sale.  RAJ's counsel deposited the funds in his attorney escrow account where they have remained.

On April 22, 1998, the Debtor filed her Chapter 13 plan which she had signed on April 7, 1998.  The Debtor listed the Contract between her and RAJ in her Chapter 13 plan as an executory contract which she intended to reject.

On June 23, 1998, RAJ filed a proof of claim in the Debtor's Chapter 13 case in the unsecured sum of $500,000 arising from the Debtor's alleged default with respect to the subject Contract.

On July 9, 1998, the Chapter 13 Debtor filed an application seeking this Court's authorization to sell the Premises to New York Property Holding Corp. ("NYPHC") for $687,500.  At a hearing held on July 22, 1998, the Court determined that the Debtor was ineligible to be a Chapter 13 Debtor pursuant to the Bankruptcy Code.  The Debtor made an oral

application to dismiss the Chapter 13 petition voluntarily and the Court denied the oral

application and converted the case to one under Chapter 7.  The Debtor filed an appeal of the

Court's denial of the application to dismiss and while the appeal of the Court's decision was

pending, John S. Peirera was appointed Chapter 7 Trustee (the "Trustee").  The Trustee solicited

bids for this bankruptcy estate's interest in the Premises.

Despite the failure to close on the Contract, RAJ's principal formed another entity, RAJ

74 Limited Partnership ("RAJ 74"), in December of 1998.  According to RAJ's principal, Fred

Marolda ("Marolda"), there was one other bidder for the Premises at the time and this bidder and

RAJ 74 were going back and forth on the bids.  Eventually RAJ 74 offered the Trustee a little

more and entered into a contract to purchase the Premises for $760,000 from the Trustee on

behalf of the Debtor's chapter 7 estate.  The Court notes that by making an offer to the Debtor's

Chapter 7  Trustee for RAJ 74 to purchase the subject property on or about December 1998, RAJ

had to have acknowledged that the subject Contract of Sale to RAJ by this Debtor had

terminated.   RAJ did not seek to have the subject Contract approved by the Bankruptcy Court

and consummated.  It merely chose to use another corporate entity to buy the subject property

from the Debtor's Chapter 7 estate.  The proposed contract with RAJ 74 would have been subject

to an application to the Court and any higher and better offers.  However, the Court never

considered the proposed contract because the Court of Appeals for the Second Circuit

determined that the Debtor's oral application to dismiss her bankruptcy case should have been

granted, *Barbieri v. RAJ Acquisition Corp. (In re Barbieri)*, 199 F.3d 616 (2d Cir. 1999), and the

Debtor's bankruptcy case was dismissed.

On January 11, 2000, years after the subject Contract was entered into, an affiliate of

6

RAJ, St. Nicholas Capital Fund, purchased the Bridge Funding mortgage.

On November 20, 2000, the Debtor filed a Chapter 11 bankruptcy petition. On March 7, 2001, the Debtor filed an application to sell the Premises to Esther Brahver for $855,000, net of any broker's commission plus a $250,000 loan to the Debtor for one year secured by the Flushing Property, for a total consideration of $1,105,000, subject to higher and better offers. Corona Park Realty LLC, another affiliate of RAJ, made a higher offer of $1,155,000 which was approved by the Court pursuant to an Order dated June 18, 2001. Although Corona Park Realty LLC was the winning bidder, Marolda purchased the Premises from the Debtor on July 6, 2001 using another one of his affiliates, 86 East 3rd St. LLC, as the purchaser of record. The $1,155,000 purchase price was $570,000 more than the purchase price set forth in the subject Contract with RAJ in February 1998.

The Debtor's Chapter 11 bankruptcy case was converted on January 11, 2002 to a Chapter 7 case and the former Trustee was again appointed to this case. On March 9, 2001, RAJ's counsel timely filed an unsecured claim in the sum of $1,000,000 against the bankruptcy estate. On May 20, 2002, RAJ timely filed a separate unsecured claim in the sum of $1,000,000 against the bankruptcy estate with respect to damages arising from the Debtor's alleged rejection of the Contract.

On April 3, 2008, the Trustee filed an application seeking the Court's approval of a proposed settlement of the claims filed by RAJ and its counsel under Bankruptcy Rule 9019. The Trustee estimated that it would cost the bankruptcy estate approximately $30,000 to litigate these claims. In order to avoid time consuming and expensive litigation and to maximize the assets of the Debtor's bankruptcy estate, the Trustee negotiated a settlement whereby, RAJ

7

agrees to reduce its $1,000,000 claim to $400,000 and RAJ's counsel would withdraw its separate claim against the bankruptcy estate. However, the Court does not view the separate claim for the sum of $1,000,000 filed by RAJ's counsel as a claim for any damages and in fact it appears to be a duplicate claim in that they both sought the same breach of contract damages. At a hearing before the Court, RAJ's counsel acknowledges that the claims were in fact the same. Therefore, the settlement in essence seeks to resolve any objection to RAJ's claim by giving RAJ a reduced allowed claim of $400,000 in order to save the bankruptcy estate $30,000 in litigation costs and from time-consuming litigation.

On April 29, 2008, Barbieri objected to the settlement alleging, *inter alia,* that RAJ repudiated the Contract by requiring the Debtor to satisfy the Bridge Funding mortgage contrary to the terms of the Contact and that the Debtor had the right to cancel the Contract pursuant to its terms. Accordingly, RAJ is only entitled to the return of its Down Payment as damages, which it already received. Even if the Debtor was found to have breached the Contract, because the Contract was the product of an arms-length negotiation between unrelated parties, RAJ's damages would be limited to the difference between the market value of the Premises and the Purchase Price of the subject Contract at the time of the alleged breach which Barbieri contends is none.

In addition, Barbieri alleges that if the $1,155,000 sale price to 86 East 3rd St. LLC is used as a measure of market value, RAJ would be required to pay back rents due to the Debtor at the closing. Barbieri asserts that the back rents amounted to $546,473.11 (when the order approving the sale of the Premises on June 18, 2001 was entered) and if the amount of such rents was to be applied as an offset of damages due to RAJ, then RAJ's total damages would only be

8

$23,526.89. Barbieri does not provide any evidence demonstrating the amount of back rent owed as of spring of 1998. Rather, Barbieri submits an informal accounting that shows that the total rent arrears owed from striking and non-striking tenants for the period of September 1, 1996 to January 31, 2001 were $497,755.57. Without a break down of the amount of the rent arrears that was owed around the time the subject contract was entered into and the alleged breach in the spring of 1998, the Court cannot determine what the amount of the offset to RAJ's claim for damages would be. In addition, RAJ argues that Barbieri's claim for any offset for back rents due to the seller was a red herring in that the back rents would have been of negligible value because the tenants may have legal defenses for nonpayment under the theory of breach of the warranty of habitability and that some of the rents may have been paid to the 7A Administrator in order to repair and maintain the Premises. Given the absence of an accurate accounting of the amount of arrears owed in Spring of 1998 and any evidence of amounts that may have been paid to the 7A Administrator and the potential defenses some of the tenants may have for nonpayment, the Court cannot consider the issue nor calculate the amount of back rents.

The Court does note that despite RAJ's argument that any back rents claimed by Barbieri as an offset to RAJ's proof of claim was negligible, RAJ had previously argued before this Court that the back rents actually had value to the bankruptcy estate. Indeed, the Court of Appeals for the Second Circuited noted in *Barbieri v. RAJ Acquisition Corp. (In re Barbieri)*, 199 F.3d 616, 617 (2d Cir. 1999), that RAJ opposed the Debtor's motion seeking the Bankruptcy Court's authorization to sell the Premises to NYPHC for $687,000 in July of 1998 arguing that RAJ's prepetition contract for $585,000, the contract at issue, would provide a greater yield to the debtor's estate because RAJ's prepetition contract provided for the payment of back rents to the

Debtor while the NYPHC contract provided for the payment of back rents to the purchaser.

Hearings on the Trustee's motion were conducted on May 1, 2008, October 6, 2008, December 19, 2008, April 2, 2009, and April 29, 2009 and various post-hearing submissions were made by the Trustee, Barbieri and RAJ after some of those hearings. The post-hearing submissions by RAJ and Barbieri included valuations of the Premises as of early 1998 for purposes of  determining damages that would arise from the alleged breach of contract by the Debtor.  Some of the hearings involved testimony regarding those valuations.

DISCUSSION

I.    Legal Standard for Approval of Settlements.

On motion by the Trustee and after notice and a hearing, the court may approve a compromise or settlement under Fed. R. Bankr. P. 9019(a) if it is "fair and equitable".  *See, e.g. Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).  In order to constitute a fair and equitable compromise or settlement, the court must find that the compromise does not "fall below the lowest level of reasonableness." *In re International Distribution Centers, Inc.*, 103 B.R. 420 (Bankr. S.D.N.Y. 1989).  The court is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant*, 699 F.2d 599, 608 (2d Cir.), *cert. denied sub nom. Cosoff v. Rodman*, 464 U.S. 822 (1983).

The court may give weight to the opinion of the trustee, the parties and their attorneys that the settlement is fair and equitable.  *See, In re Copperfield Investments, LLC*, 401 B.R. 87, 92 (Bankr. E.D.N.Y. 2009).  It is not necessary for the court to rule on disputed issues of fact and law or to conduct a "mini trial" on the merits of the underlying litigation.  *Id. (citing In re*

10

*Adelphia Commc'ns Corp.*, 327 B.R. 143, 157 (Bankr. S.D.N.Y. 2005)). "At the same time, a

court may not simply defer to a trustee's judgment, but must independently evaluate the

reasonableness of the settlement." *Id.*

      In deciding whether a settlement falls below the lowest point in the range of

reasonableness, the Second Circuit has set forth the following factors:

      (1) the balance between the litigation's possibility of success and the settlement's future
benefits;
      (2) the likelihood of complex and protracted litigation, "with its attendant expense,
inconvenience, and delay," including the difficulty in collecting on the judgment;
      (3) "the paramount interests of the creditors," including each affected class's relative
benefits "and the degree to which creditors either do not object to or affirmatively support the
proposed settlement";
      (4) whether other parties in interest support the settlement;
      (5) the "competency and experience of counsel" supporting, and "[t]he experience and
knowledge of the bankruptcy court judge" reviewing, the settlement;
      (6) "the nature and breadth of releases to be obtained by officers and directors"; and
      (7) "the extent to which the settlement is the product of arm's length bargaining.

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478

F.3d 4542, 462 (2d Cir. 2007)(*quoting In re WorldCom, Inc.*, 347 B.R. 123,137 (Bankr.

S.D.N.Y. 2006).

      To determine whether the Trustee's settlement with RAJ crosses the threshold of

reasonableness, the Court must first decide whether the Debtor breached the Contract in order to

determine whether RAJ would be entitled to any claim for damages.

II.     Termination of the Contract.

      The Debtor sought to cancel the Contract and return the Down Payment to RAJ on April

 8, 1998, approximately 2 weeks after she filed for Chapter 13 relief and the title report was

amended to include the Bridge Funding mortgage.  Indeed, the Debtor's proposed Chapter 13

indicated that she intended to reject the Contract.  Barbieri argues that the Debtor was not

obligated to satisfy any defect or encumbrance listed in the Initial Title Report dated January 19,

1998, and the supplement dated March 28, 1998, that exceeded $25,000 and she was certainly

not required to spend more than the net proceeds of sale in order to satisfy any encumbrance.

According to the Title Report and the Debtor's bankruptcy schedules filed in April of 1998, (a)

Tormax Realty Corp.'s first mortgage had a principal balance of approximately $162,000; (b) the

judgment lien held by Hoccheier and Aronson and later assigned to Gilbert Greenberg, Esq. was

approximately $65,000; (c) the scheduled balance of the second mortgage held by Lena Barbieri

in the Debtor's Schedule D as of the relevant petition was $246,000[1]; (d) the Environmental

Control Board had a lien of approximately $1,350; (e) The City of New York had a lien for real

estate taxes, water and sewer in the approximate amount of $25,350; and (d) there existed a lien

for emergency repairs in the amount of $883.41.  With the inclusion of the $350,000 Bridge

Funding mortgage, the Debtor would have exceeded the $25,000 limit and needed to spend more

than the net proceeds of sale in order to satisfy all the liens against the Premises.  Barbieri argues

that under Section 13.02 of the Contract and accompanying second rider, the Debtor's liability

was limited to the return of the Down Payment if she could not convey good title.  Accordingly,

the contract was null and void by its terms.

Generally, parties to a contract may agree to restrict the liability resulting from the seller

being unable to convey good title.  *See, e.g., Emptage & Associates, Inc. v. Cape Hampton,* LLC,

19 A.D.2d 536, 537 (N.Y. App. Div. 2005); *Progressive Solar Concepts v. Gabes*, 161 A.D.2d

---

[1] Lena Barbieri had assigned her second mortgage interest to Hochheiser & Aronson as partial payment of a judgment entered against Louis Barbieri for non-payment of legal fees. It is unclear as to why the second mortgage was transferred from Hochheiser & Aronson to Gilbert Greenberg, Esq.  The second mortgage was subsequently assigned to Louis Barbieri.

752, 753 (N.Y. App. Div. 1990); *Mokar Properties Corp. v. Hall*, 6 A.D.2d 536, 539-540 (N.Y. App. Div. 1958). However, to avail itself of such limitation of liability, the seller must act in good faith. *Emptage & Associates, Inc. v. Cape Hampton,* LLC, 19 A.D.2d at 537; *Progressive Solar Concepts v. Gabes*, 161 A.D.2d at 753. The limitation of liability provision contemplates the existence of a situation beyond the control of the parties. *See Karl v. Kessler*, 47 A.D.3d 681 (N.Y. App. Div. 2008); *Emptage & Associates, Inc. v. Cape Hampton,* LLC, 19 A.D.2d at 537. "The vendor is under a duty to take affirmative action to convey a marketable title according to his contract of sale. . . . If the vendor has contracted to convey, knowing that there are circumstances that will render it impossible to do so, or if he is able with reasonable expenditure of money and effort to remedy defects in title and neglects or refuses to do so, he has not acted in good faith; and he cannot then limit his damages by shielding himself behind such self-created or easily scaled barriers." *Mokar Properties Corp. v. Hall*, 6 A.D.2d at 539-540. *See also*, *Karl v. Kessler*, 47 A.D.3d at 681 (finding good faith by seller to cure a defect in title where seller immediately extended an appropriate offer to settle pending litigation with respect to the property and when settlement efforts failed, to diligently defend that litigation and conducting discovery).

A seller's unwillingness to pursue all reasonable methods to obtain marketable title is not the same as being unable to convey title in accordance with the terms of the contract. *See Barnett v. Star Mechanical Corp. et al.*, 171 A.D.2d 142, 146 (N.Y. App. Div. 1991) (finding lack of good faith where seller did not make any efforts to clear title nor sought to challenge the validity of an assignment of a mortgage or otherwise sought discharge of the mortgage). "Where there are allegations that the seller's default is willful and deliberate, the question of the seller's lack

13

of good faith cannot be resolved on pleadings and affidavits." *Mancini-Ciolo, Inc. v. Sacramellino*, 118 A.D.2d 761, 762 (N.Y. App. Div. 1986).

In this case, the Debtor can exercise the limitation of liability provision of the Contract since she demonstrated that she diligently sought to convey good title and in good faith was unable to do so.  Notwithstanding the title company's failure to include the Bridge Funding mortgage in the Initial Title Report, this was not a situation where the Debtor neglected or refused to resolve the Bridge Funding mortgage.  Rather, the Court finds the fact that the Debtor was attempting to void the Bridge Funding mortgage in a state court action at or before she entered into the Contract as an indication that she entered the contract in good faith. When the state court action was then dismissed, she reasonably believed that she could not in good faith timely convey marketable title.  Although the Debtor could have commenced an adversary proceeding in her bankruptcy case to seek to avoid the recording of the Bridge Funding mortgage as a preference, any action would unlikely be resolved prior to the anticipated closing date and probably would have been contested by Bridge Funding as it had at the time and continued to contest any attack on its lien at a later time.  It is uncertain whether the Debtor even had the financial wherewithal to pursue further litigation on the Bridge Funding mortgage since her Schedules I and J to her Chapter 13 bankruptcy petition showed that her sole income at the time was rental income from property and her monthly expenses exceeded her income. Moreover, under section 13.02 of the Contract and the accompanying rider, the Debtor was clearly not required to pursue further litigation on the Bridge Funding mortgage or incur any expenses in excess of $25,000 to cure any title defect or to incur monies in excess of the amounts payable at closing.  On the other hand, the contract provided that the purchaser could have

14

purchased the Premises subject to the Bridge Funding mortgage but it chose not to do so.  Yet, several years later, the purchaser actually purchased the Bridge Funding mortgage through a related entity.  As there would be insufficient funds at closing to satisfy the mortgages and liens when the Debtor's state court action against Bridge Funding was dismissed, it is clear that the Debtor could not financially comply with the terms of the Contract.  While the Debtor is required to make all reasonable efforts to obtain marketable title, the Debtor was not required to sell the Flushing Property in order to satisfy the Bridge Funding mortgage.  The Court finds that the Debtor reasonably believed she could not in good faith convey good title pursuant to the terms of the contract under the circumstances.

RAJ asserts that regardless of the limitation of liability provision, the Debtor had no right to cancel the Contract.  The right to cancel resided with RAJ and RAJ did not repudiate the Contract.  However, under Section 13.02 of the Contract, if the seller is unable to convey title in accordance with the terms of the Contract or if the purchaser has other grounds for refusing to consummate the purchase, the *purchaser nevertheless may elect to accept such title as the seller may be able to convey with a credit against the monies payable at closing equal to the reasonable estimated cost to cure the same up to $25,000 but without any other credit or liability on the part of the seller or accept the return of its down payment*. (Emphasis added). Although a related entity to RAJ purchased the Bridge Funding mortgage a few years later in 2000, at the time the Debtor conveyed her inability to proceed with the Contract under its terms in April of 1998, RAJ did not elect to accept such title and assume the Bridge Funding mortgage nor did it accept the return of its Down Payment.  Rather, RAJ sought to have the Debtor satisfy the Bridge Funding mortgage by selling or otherwise involving the Flushing Property without any offer to

fund such litigation.

Although RAJ did not make any absolute declaration that it will not or cannot purchase the Premises, when a party refuses to make an election of remedies under a contract to either accept title with a cloud or the return of its down payment, and, in some cases, demands a closing to proceed under new terms then the purchaser can be held to have defaulted under the contract and the contract is deemed terminated. *See Mehlman v. 592-600 Union Avenue Corp.*, 46 A.D.3d 338, 342-344, 847 N.Y.S. 2d 547 (N.Y. App. Div. 2007); *Emptage v. Assoc., Inc. v. Cape Hampton, LLC*, 19 A.D.3d at 538. Such a finding of repudiation against the purchaser is premised upon the seller first showing that it had attempted to convey marketable title to the purchaser in good faith but was unable to do so and that the seller should be entitled to the benefit of the limitation of liability provision in the contract. *See Mehlman v. 592-600 Union Avenue Corp.*, 46 A.D.3d at 342-344; *Emptage v. Assoc., Inc. v. Cape Hampton, LLC*, 19 A.D.3d at 538.

As discussed above, the Court finds that the Debtor was unable to convey marketable title in good faith and is entitled to the benefit of the limitation of liability provision in the Contract. Because RAJ refused to accept either the return of the down payment or title with a cloud, the parties were at an impasse and it would have been futile for the Debtor to continue with the Contract under the circumstances. Accordingly, the Contract was deemed terminated pursuant to its terms. The Debtor's only liability to RAJ was the return of its Down Payment and RAJ is not entitled to any claim for damages.

III.    Measure of Damages.

Assuming for argument sake, the Debtor had breached the contract, the value of the

provable damages by RAJ would be substantially less than $400,000 under the Trustee's settlement let alone the $1,000,000 claimed by RAJ. Under New York law, where the seller breached the contract in bad faith, the buyer may obtain damages for the loss of his bargain which is measured as the difference between the market value of the property *at the time of the breach* and the contract price, plus reasonable attorney's fees and other expenses necessarily incurred in reliance upon the contract, with interest from the date of the breach. *See Astoria Caterers, Inc. v. J&P 1870 Realty Corp. et. al.*, 24 A.D.3d 478, 480, 806 N.Y.S.2d 242 (N.Y. App. Div. 2005); 91 B.R. 1, *3 (Bankr. E.D.N.Y. 1988)(damages for breach of contract is the difference between the fair market value of the property and the contract price); 91 N.Y. Jur. 2d Real Property Sales and Exchanges §§ 225-226, 229 (2008).

In determining the fair market value of real property at the time of the breach, various courts have noted that the valuation of assets is not an exact science and must be done on a case-by-case basis. *See e.g., In re CGE Shattuck*, No. 99-12287-JMD, 2000 Bankr. LEXIS 1783, *3 (Bankr. D.N.H. 2000); *In re Melgar Enter., Inc.*, 151 B.R. 34, 39 (Bankr. E.D.N.Y. 1983). When evaluating real property, appraisers are called upon to use their judgment in determining the steps of the appraisal and the best statistics, comparables and facts to utilize. The Court is aware that appraisal work is subjective. *See Buckland v. Household Realty Corp. (In re Buckland)*, 123 B.R. 573, 578 (Bankr. S.D. Ohio 1991)(noting that valuation is "ultimately the opinion of a particular appraiser"). It is the role of the Court to sift through the appraisals and testimony and make a judgment as to the "accuracy and credibility" of the appraisers. *See In re Miami Beach Hotel Investors LLC*, 304 B.R. 532, 535 n.4 (Bankr. S.D. Fla. 2004). "[T]he courts have wide latitude in determining value. A court is not bound by values determined by

appraisals but rather form its own opinion as to the value of the subject property after consideration of the appraisers' testimony and their appraisals." *Karakas v. Bank of N.Y. (In re Karakas)*, Adv. Pro. No. 06-80245, 2007 Bankr. LEXIS 1578, *16-17 (Bankr. N.D.N.Y. May 3, 2007).

RAJ submitted a valuation conducted by Marolda, who is RAJ's director and officer and a licensed real estate broker specializing in real estate located in the East Village and the Lower East Side in Manhattan. Since 1989, he has operated his own real estate management company. He is also the person who negotiated the subject Contract on behalf of RAJ and the principal of the entity that ultimately purchased the Premises years later. Marolda did not qualify as an expert appraiser but testified as to valuation of the Premises based upon his knowledge and experience in buying and managing properties in the East Village and the Lower East Side. He generally bought properties at market value and increased their value by holding onto the properties long term rather than by "flipping" the properties for a higher price as the value of the properties appreciated.

It is Marolda's belief and testimony that the $585,000 Purchase Price was below the $1 million he attributed to value of the Premises because other potential buyers were discouraged from purchasing the Premises as a result of the rent strike and Article 7A state court proceeding. Any buyer would have had to remedy the numerous code violations and have difficulty obtaining the financing because of the notice of pendency filed against the Premises and the absence of a rent roll for a lender to review given the rent strike. He felt that he could get the Premises for less than $1 million because 1) 90% of the code violations were housekeeping items that could be remedied within 30 days; 2) even though there was an Article 7A proceeding pending, given

18

his history for managing buildings, his title company would have agreed to insure a lender against a notice of pendency while other lenders might be hesitant to provide financing unless the notice of pendency was removed prior to closing; and 3) once the code violations were cleared, tenants had no excuse not to pay the rent arrears and given the inability to pay large arrears, many existing tenants would be amenable to accepting buyouts plus a forgiveness of rent arrears in exchange for vacating their low rent units, which would allow him to lease the apartments to new tenants willing to pay higher rents.

Marolda's valuation is based upon what he believes the potential value the property would be to him in his business judgment after the repairs have been made, the violations corrected and the rental rates have been raised and his valuation does not necessarily reflect the fair market value of the Premises at the time of the alleged breach of contract. In fact, he himself testified as to all of the obstacles a buyer would have to overcome in order to ultimately benefit from its purchase as of the date of the contract. The same reasoning was available to other similar minded investors and, in fact, NYPHC sought to purchase the Premises from the Trustee in July of 1998 for $687,000, approximately 4 months after the Debtor's alleged breach of the Contract with RAJ. Although the proposed contract price with NYPHC was approximately $100,000 more than the $585,000 offered by RAJ, NYPHC's offer was still substantially under the $1 million value claimed by RAJ.

Barbieri retained Wm. Shubert & Co. to appraise the Premises as of January 3, 1998. William Shubert ("Shubert"), the principal of Wm. Shubert & Co., has 30 years of experience of appraising real property in New York City and was qualified to testify as an expert witness. However, Shubert performed only an external inspection of the Premises in January 2009 as he

was unable to gain access to any of the apartment units or the stores at the time.  Like Marolda, Shubert compared the Premises with several mixed-use buildings in the East Village and Alphabet City area that were sold during the period of October 1996 to November 1997.  Shubert accounted for the appreciation in property prices, the difference in size and the location of the comparables used but was unable to factor in the differences as to the condition of the buildings because he lacked information regarding the condition of the comparables.  Based upon the sale comparisons, Shubert concludes that the Premises was worth at an "as is" market value of $585,000, the same as the Contract price.

It appears that the best support for RAJ's arbitrariness in calculating its damage claim is its own proof of claim filed in the Debtor's Chapter 13 bankruptcy case on June 23, 1998, less than 3 months from the time of the Debtor's alleged breach of the Contract.  RAJ filed a $500,000 claim for breach of the very same Contract.  There is no evidentiary support provided with that proof of claim showing how RAJ calculated its $500,000 damages claim.  If the $500,000 claim was meant to be the value of the Premises in 1998, then clearly, RAJ would not be entitled to any damages for breach of contract because the Contract Purchase Price of $585,000 would be greater than the value of the Premises.  Conversely, in order for the $500,000 claim to be damages arising from the difference between the value of the Premises and the Contract purchase price, it would mean that RAJ thought that the value of the Premises was $1,085,000.  However, shortly after the alleged breach, as discussed above, the Court finds that there is no support for the Premises having a value of $1 million as of that date.

Moreover, there is no explanation as to why RAJ increased its proof of claim for

20

damages arising from the same alleged breach of the Contract by 100% from the $500,000 claim filed in the Debtor's first bankruptcy case to the $1,000,000 in this case, unless RAJ was accounting for the appreciation in the value of the Premises from 1998 to 2001 even though the measure of damages applicable in this proceeding is the value of the Premises at the time of the alleged breach.  Indeed, the Court finds Marolda's valuation of the Premises to be based less on objective factors but more subjective considerations as to his expectations and speculation as to the potential profit he could generate from the Premises at a time of quickly rising real estate values.

At this time, the Court need not fix a number to RAJ's claim for damages but rather needs to determine only whether the Trustee's settlement of RAJ's claim for $400,000 falls below the lowest level of reasonableness.

Although the Trustee's settlement seeks to avoid the expense and burden of litigation over RAJ's claim, the Court finds the settlement of RAJ's claim for $400,000 to be unreasonable and not in the best interest of creditors of this bankruptcy estate because it would give RAJ more than what RAJ is entitled to for its claims in this case.

## CONCLUSION

The Court finds that the evidence adduced as of the date of the alleged breach of contract does not support the claim that the Debtor breached the contract.  The Plaintiff is entitled to the $25,000 it has already received and any additional minor costs as stated in the contract.  By not accepting the choices the Buyer had in the subject contract, the contract terminated by its own terms without breach by the Seller.

21

Even if this Court did not find that the Debtor had not breached the contract, RAJ would not be entitled to a claim of $1,000,000.  Upon an objection to its claim, RAJ would need to provide evidence to support an allowance of this claim in the sum of $1,000,000 as of the date of the alleged breach.  Pursuant to the testimony and evidence presented and record made before this Court, there is no evidence to support this claim in an amount even close to the $400,000 requested by this compromise offer, particularly since the Debtor had not breached the Contract. Therefor, the Court denies the granting of the compromise offer.

Based upon the foregoing, the Trustee's motion to settle RAJ's claim and the claim of RAJ's counsel for breach of contract damages for $400,000 is denied as not being in the best interest of creditors and the bankruptcy estate.

Dated:          Central Islip, New York
                December, 29, 2009

                               SO ORDERED:


                               __/s/ Dorothy Eisenberg_____
                               DOROTHY EISENBERG
                               UNITED STATES BANKRUPTCY JUDGE